No. 79,281

STATE OF KANSAS, *Appellee,* v. DAMON L. MCCRAY, *Appellant.*
(979 P.2d 134)

Opinion filed
May 4, 1999. 

*Chris R. Davis*, of Phelps, Chartered, of Topeka, argued the cause and was on the brief for appellant.

*Angela M. Wilson*, assistant district attorney, argued the cause, and *Christine K. Tonkovich*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his conviction of first-degree felony murder, K.S.A. 21-3401(b). Defendant claims there was insufficient evidence to support the underlying felony in the felony-murder conviction, he was denied a fair trial by the prosecutor's closing argument, and the trial court erred in finding that a witness was unavailable.

Late in the evening on August 14, 1996, the victim, Onzie Branch, and three of his friends, Corey Johnson, Danny Thompson, and Sonny Smith, were parked in Johnson's car outside Langston's nightclub in Lawrence, Kansas, drinking and visiting with friends. Branch was seated in the front passenger seat of the car.

After a short time, Johnson recognized the defendant, Damon McCray, in another car and decided to ask McCray if he had any marijuana to sell. McCray said he had no marijuana. Johnson returned to his car. A short time later, as Johnson was getting ready to leave the parking lot, he heard gunshots and saw a flash from a gun aiming in his direction from over the top of a grey van parked a short distance from his car. Johnson ducked down in the car seat.

When the shooting stopped, Johnson noticed that Branch was bleeding. Johnson drove out of the parking lot to take Branch to the hospital. On the way to the hospital, he stopped his car and flagged down a Lawrence police officer who called an ambulance. Branch was pronounced dead at the hospital.

Although Branch suffered several gunshot wounds, the coroner determined that Branch died from a single gunshot wound to the

head. The bullet entered Branch's head from the right rear, and travelled from the back to the front in a slightly downward direction. Bullet fragments and a bullet jacket were recovered from inside Branch's brain. The bullets recovered were .38 or .357 caliber, all fired from the same revolver.

Detective Dan Ward of the Lawrence Police Department assisted in processing the crime scene. The van over which Johnson saw the gunshots fired was examined for fingerprints. A full left hand palm and fingerprints were lifted from the hood. The prints matched those of McCray. A cast was made of a footprint in the sand near the van where the shooter had been standing.

During the investigation, several eyewitnesses described a black man of heavy build in the parking lot at the time of the shooting. The witnesses' descriptions of the man's clothing varied. None of the eyewitnesses identified McCray as the shooter.

McCray was charged with first-degree premeditated murder and, in the alternative, first-degree felony murder, *i.e.*, killing the victim by maliciously and intentionally discharging a firearm at an occupied motor vehicle. McCray was not separately charged with the underlying felony.

McCray's first trial resulted in a mistrial when the jury was unable to agree on a verdict. McCray was again tried to a jury. The second jury found McCray guilty of first-degree felony murder. McCray was sentenced to life imprisonment. McCray appeals the conviction.

## SUFFICIENCY OF EVIDENCE

McCray was convicted of first-degree murder based on a killing which occurred during the course of a felony—criminal discharge of a firearm at an occupied vehicle. He contends that the evidence was insufficient to convict him of the underlying felony.

To support a conviction for felony murder, all that is required is to prove that a felony was being committed, which felony was inherently dangerous to human life, and that the homicide which followed was a direct result of the commission of that felony. *State v. Carr*, 265 Kan. 608, 615, 963 P.2d 421 (1998). Specifically, McCray challenges the sufficiency of the evidence to support the

jury's determination that he was the shooter who fired gunshots into the vehicle occupied by Onzie Branch. When the sufficiency of the evidence is challenged, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Claiborne*, 262 Kan. 416, 425, 940 P.2d 27 (1997).

There were two pieces of physical evidence introduced at trial to identify McCray as the shooter: the palm and fingerprints from his left hand found on the hood of the van from which the gunshots were fired and a shoe print in the sand near the van. The shoe print could not positively be identified as McCray's shoe print nor could it be conclusively excluded as McCray's shoe print.

Doria Harjo, a woman who lived in the neighborhood of Langston's, testified that seconds after the shooting she saw a black man wearing white shorts run from the building next to Langston's and jump into a car. Mahogany Payne, a woman who had just arrived at Langston's at the time of the shooting, described the shooter as a black man wearing beige or white shorts and a white shirt with a red insignia on it. Tina Bowlin, another woman in Mahogany Payne's party, described the shooter as a black man wearing dark jeans and a plain white T-shirt.

Damon Hall, a companion of the defendant, testified that on the night of the shooting, he, McCray, and two other men went to Lawrence in a car Hall had rented for the occasion. Before leaving McCray's home, Hall noticed a revolver on the living room table. Hall observed McCray put the revolver in his waistband before leaving the house.

Hall testified that when his party arrived at Langston's, they were denied entrance because their clothing did not conform to the dress code. They stayed in the parking lot of Langston's and visited with acquaintances, drinking and smoking marijuana. Hall testified that Corey Johnson came to his car and asked if they had any marijuana. After being told that they had no marijuana, Johnson returned to his car. Hall looked over into Johnson's car and noted that Onzie Branch was in the passenger seat. Hall knew that Da-

mon McCray and Onzie Branch had a history of violence toward each other. McCray told Hall that "this would be a good chance for him to get Onzie."

Hall pulled his car around to the back of Langston's and backed the car into a parking stall for a quick exit. McCray left Hall's car to confront Onzie Branch. Hall lost sight of McCray as McCray walked toward Langston's. Moments later, Hall heard arguing and shots being fired. Thirty to forty seconds later, McCray reappeared on the passenger side of Hall's car. McCray entered the car and told Hall, "Let's go. Drive to Kansas City." Hall noted that McCray was agitated. As they were driving away from Langston's, Hall asked McCray what had happened. McCray said that he had fired four shots into Corey Johnson's car and that he believed he hit somebody.

McCray asserts that Hall's testimony at the second trial was not credible because it varied from his testimony at McCray's first trial. McCray argues that because the eyewitnesses did not identify him as the shooter, the physical evidence was inconclusive and Hall's testimony was suspect; therefore, the evidence at trial was insufficient to establish beyond a reasonable doubt that he was the shooter.

In essence, McCray is asking this court to discount Hall's credibility. Issues of credibility are within the province of the jury. On appellate review, the credibility of witnesses will not be passed upon, conflicting evidence will not be weighed, and all questions of credibility are to be resolved in favor of the State. *State v. Clemons*, 261 Kan. 66, Syl. ¶ 4, 929 P.2d 749 (1996). The time for casting doubt on Hall's testimony was at trial, not on appeal. McCray's defense counsel fully cross-examined Hall at trial regarding the inconsistencies between his trial testimony and statements he had given on prior occasions. The jury was aware of that aspect of Hall's testimony. This court is not at liberty to pass on the credibility of Hall's statement.

Viewing all the evidence in a light most favorable to the State, a rational factfinder could have found McCray guilty beyond a reasonable doubt.

## CLOSING ARGUMENT

McCray contends that certain remarks made by the prosecutor in closing argument were unduly prejudicial and denied him his Sixth Amendment right to a fair trial. McCray categorizes the prosecutor's remarks as (1) personal opinions, (2) appeal to community values, and (3) comments on the credibility of certain evidence.

Dignity of the court, decorum of the trial, and interest of truth and justice forbid license of speech in arguments to jurors outside the proper scope of professional discussion. *State v. Ruff*, 252 Kan. 625, 635, 847 P.2d 1258 (1993). It is the duty of the prosecutor to see that the State's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction, but the prosecutor should always bear in mind that he or she is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he or she should preserve. 252 Kan. at 634. Where counsel refers to pertinent facts not before the jury or appeals to prejudices foreign to case, it is the duty of the court to stop counsel then and there, and the court need not and ought not to wait to hear an objection from opposing counsel. 252 Kan. at 635.

The plain error rule is defined as follows:

"This rule that plain errors affecting substantial rights may be considered on motion for new trial or on appeal though not raised in trial court if manifest injustice or miscarriage of justice has resulted, is invoked on case to case basis, but there must be sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if the rule is not invoked. *State v. Meiers*, Mo., 412 S.W.2d 478, 480. For there to be 'plain error' warranting reversal absent objection, there must be legal impropriety affecting defendant's substantial rights, sufficiently grievous to justify notice by reviewing court and to convince it that, of itself, error possessed clear capacity to bring about unjust result. *State v. Harris*, A.D., 174 A.2d 645, 646, 70 N.J.Super. 9. Doctrine which encompasses those errors which are obvious and highly prejudicial, which affect the substantial rights of the accused, and which, if uncorrected, would be an affront to the integrity and reputation of judicial proceedings. *U.S. v. McCord*, 166 U.S.App.D.C. 1, 502 F.2d 334, 341." Black's Law Dictionary 1150 (6th ed. 1990).

Under normal circumstances Kansas does not apply the plain error rule; a contemporaneous objection is normally required to preserve an issue of improper closing argument for appeal. *State*

*v. Spresser*, 257 Kan. 664, 674, 896 P.2d 1005 (1995) (Abbott, J., concurring). A trial court has a duty under the plain error rule to protect a defendant's constitutional right to a fair trial and should not hesitate to prevent prosecutorial misconduct from occurring regardless of whether a timely objection has been lodged. See *State v. McClanahan*, 259 Kan. 86, 910 P.2d 193 (1996); *State v. Gray*, 25 Kan. App. 2d 83, Syl. ¶ 5, 958 P.2d 37 (1998). There was no contemporaneous objection by the defendant to most of the prosecutor's comments complained of in this appeal. McCray asserts that each of the prosecutor's remarks violated the plain error rule. Therefore, the claimed offending remarks will be considered to determine if the remarks so affected the substantial rights of the defendant and brought about an unjust result.

The analysis of the effect of a prosecutor's allegedly improper remarks is a two-step process. First, the appellate court determines whether the remarks were outside of the considerable latitude the prosecutor is allowed in discussing the evidence. Second, if the remarks are found to be improper, the court must consider whether, in light of the record as a whole, they are so prejudicial as to amount to reversible error. Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her the right to a fair trial. In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt. *State v. Collier*, 259 Kan. 346, Syl. ¶¶ 5, 6, 913 P.2d 597 (1996).

McCray asserts that the prosecutor represented to the jury his personal opinion that McCray was guilty of the murder of Onzie Branch. The State asserts that the prosecutor's comments were no more than the prosecutor arguing that the jury should conclude from the evidence that McCray was guilty of the murder of Onzie Branch. The State claims that the cases where this court has found error in a prosecutor's contention to the jury that the defendant was guilty can be distinguished from this case because those cases involved statements where the prosecutor put himself or herself in

the position of a witness with personal information regarding the defendant's guilt. See *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984); *State v. Williams*, 228 Kan. 723, 732, 621 P.2d 423 (1980); *State v. Henderson*, 226 Kan. 726, 735, 603 P.2d 613 (1979).

## Personal Opinion

The prosecutor discussed the State's burden of reasonable doubt:

"A reasonable doubt. That is the State's burden. We accept that burden and we have met that burden. The defendant Damon McCray is guilty of murder in the first degree beyond a reasonable doubt. We have met that. And I'm going to tell you how. I'm going to try to reflect back on some of the testimony."

Near the close of the prosecutor's closing argument, the prosecutor again stated, "The evidence is convincing beyond a reasonable doubt."

To show the defendant's motive for killing the victim, the prosecutor reviewed with the jury the evidence that McCray and Branch had a violent history which included an incident at a shopping mall where Branch hit McCray in the head with a weight. The prosecutor reminded the jury that shortly after the mall incident, Branch was sent to prison and stated that the evening at Langston's was the first opportunity since the mall incident for McCray to retaliate. The prosecutor stated, "If you were . . . that man at that time you can put the other person in the grave. That's what he did. He retaliated. I mean that's what it came to. That's how things are."

Regarding the fact that there were no eyewitnesses who could identify the shooter, the prosecutor stated that such was typical in a murder case. The prosecutor then opined that the lack of eyewitness testimony was not fatal to his case against McCray because McCray had left incriminating evidence at the murder scene—his fingerprints:

"Did anybody testify, yes, I saw that man murder Onzie Branch. No, no one did that. There was no camera there. If you're expecting a videotape of what happened, you're not going to get it because most defendants that commit crimes

especially murder try to do it with without people seeing them. They don't want any witnesses so they try to hide the best they can.

"In this case the defendant hid from the people by standing in front of the van. He hid from the people in Langston's by running to the south and back off [*sic*] the building. He couldn't hide everything since Onzie was kind of out in the open. He left his basic physical description behind. And, oh, one other thing he left behind. His fingerprints. He left his fingerprints behind. Oops. Should have been wearing gloves that night, Mr. McCray, because you signed your work. He left his signature behind."

The prosecutor improperly characterized Branch's death as an execution by McCray without a fair trial:

"Did Damon McCray give Onzie Branch any opportunities before he deprived him of his life and his liberty? He didn't give him a fair and impartial trial, did he? He was Judge; he was juror; he was executioner.

"[McCray] didn't give Onzie Branch anything fair and impartial. There's nothing. We've given [McCray] fair and impartial."

In his summary, the prosecutor stated:

"Someone is responsible for the murder of Onzie. Somebody is, and that somebody, ladies and gentlemen, is only feet from you. That someone as you know is Damon LaShawn McCray. Look at him, ladies and gentlemen, you have to look at him. That's what a murderer looks like, ladies and gentlemen."

It is a well-established rule in this state that error is committed when a prosecutor injects his or her personal opinion into closing argument. *Ibu-Isba*, 235 Kan. at 859. The statements made by the prosecutor in this case regarding the prosecutor's personal opinion of the defendant's guilt were error.

### Appeal to Community Values

McCray complains that the prosecutor improperly appealed to the jury's duty to protect the community values of Lawrence, Kansas. In support of this claim, McCray points out that he was not from Lawrence, but from Topeka, and the prosecutor made reference in closing to what a person cannot get away with in Douglas County: "[McCray] retaliated [against Branch]. . . . That's how things are. But not here, ladies and gentlemen, you can't commit murder here in Douglas County and get away with it. You can't commit it anywhere and get away with it. This is murder." There was no objection to the prosecutor's remark.

The prosecutor's remark in this case is very similar to the statement made by the prosecutor in *Ruff*, 252 Kan. 625. In *Ruff*, the prosecutor stated in closing: " 'Ladies and gentlemen of the jury, do not allow this conduct to be tolerated in our county. . . . Thank you. Send that message, ladies and gentlemen, come back with a verdict of guilty. Thank you.' " 252 Kan. at 631. The *Ruff* court found that the prosecutor's statement implied that if the jury found Ruff not guilty, her conduct would be tolerated. 252 Kan. at 636. The *Ruff* court found that "[t]he prosecutor's statement was improper and transcends the limits of fair discussion of the evidence" and reversed Ruff's conviction. 252 Kan. at 636.

Not every trial error or infirmity which may call for application of appellate court supervisory powers correspondingly constitutes a failure to observe the fundamental fairness that is essential to the very concept of justice. When specific guarantees of the Kansas Constitution Bill of Rights are involved, courts must take special care to insure that prosecutorial misconduct does not impermissibly infringe upon those guarantees. *Ruff*, 252 Kan. at 631.

The *Ruff* court found that because the defense counsel had objected and the court, in effect, approved the remark, a general instruction given prior to the improper statement that remarks of counsel were not evidence was not sufficient to protect the defendant's right to a fair trial. 252 Kan. at 636. Here, there was no contemporaneous objection nor did the trial judge refuse to admonish the jury. Under the facts, the prosecutor's remark did not rise to the level of reversible error.

### Comments on the Credibility of Evidence and Witnesses

In closing, the prosecutor warned the jury that the defense's case was no more than smoke, a deception:

"Mr. Betts [the defense attorney] told you that he had a job; that he had a duty, and an obligation to present evidence to keep you from convicting an innocent man.

"That's right. He had a job and obligation. What he's trying to do, ladies and gentlemen, is what we refer to in the legal profession is create a smoke screen to confuse you. He did that during cross-examination.

"You remember I would ask witnesses questions for some period of time and then he would ask them questions three or four times longer than I did in an attempt to confuse you, to convert [*sic*] your attention away from the simple fact that his client's a murderer. Mr. Betts is trying to knock you off the trial anyway he can."

The defense counsel objected and asked the court for an admonishment. The court declined to admonish and asked the prosecutor to continue. Later in the argument, the prosecutor returned to the smoke screen theme:

"Now, part of this attempt or smoke screen on the part of Mr. Betts is to accuse Damon Hall of doing it."

"There's no evidence that Damon Hall wanted Onzie Branch dead. None at all. Smoke screen. Look over here at Damon Hall. That's what he's try to do is divert your attention away from his client.

"You don't have to fall for that. That is his job. He told you that. He does a good job, no doubt about it, but he's going to fool you. He said you better be ready before you convict; that you are going to be grieving about Mr. McCray and his liberty for the rest of your life to make that decision. Does that scare you? That's a serious responsibility but, again, an intimidation to scare."

The defense counsel objected, and the court sustained the objection. No admonishment was requested or given. Later in the argument, the prosecutor again returned to the theme of deception on the part of the defense: "Be careful of the deception. Be careful of the smoke. You've got to see your way through that. If you don't, justice will not prevail."

The prosecutor then referred to a comment the defense counsel made in his closing regarding the Lawrence, Kansas, law enforcement agency:

"On one hand [Mr. Betts] sits here and says the law enforcement agency as [a] whole is the [most honest] he's ever worked with.

. . . .

"Most honest agency he's work[ed] with. On the other hand, he infers that there's this big conspiracy going on."

Again, the defense counsel objected, but the court remarked that the prosecutor's comment was appropriate. The prosecutor continued with remarks about a conspiracy theory:

"They're all—it's one big conspiracy, the police department, Damon Hall, Doria Harjo, Mahogany Payne, all one big conspiracy out to get Damon McCray. That's

what you'd have to believe to let him go. That's what he wants you to believe. One big conspiracy."

In *State v. Lockart*, 24 Kan. App. 2d 488, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997), the Court of Appeals considered comments made by a prosecutor which included a reference to the State's evidence as "smoke and mirrors." In *Lockart*, the credibility of the defendant was the dispositive issue. In closing, the prosecutor referred to the defendant as a liar and drug dealer. He advised the jury that Lockart had had 1 year and 2 months to think about the defense he was going to raise and what lies he could perpetrate. He commented in his argument that the defense counsel had attempted to penetrate the facts with "fog, smoke, or mirrors." He asked the jury to put itself in the place of a drug dealer to determine the credibility of Lockart's statements. All of these comments were made without objection. 24 Kan. App. 2d at 490.

The *Lockart* court found that the prosecutor's comments referring to the defendant and the defense counsel as liars was a serious breach of the standard of fair comment permitted to lawyers when making closing arguments. The *Lockart* court termed the prosecutor's comments gross and flagrant and determined that the comments rose to the level of a constitutional error. The *Lockart* court stated: "Trials cannot be allowed to degenerate into name-calling contests. Juries must be given an opportunity to exercise reason and sound judgment in deciding the facts of a case, free from passion and prejudice." 24 Kan. App. 2d at 492.

The prosecutor's comments in this case bear a similarity to the comments made by the prosecutor in *State v. Mosley*, 25 Kan. App. 2d 519, 965 P.2d 848, *rev. denied* 266 Kan. 1113 (1998). In *Mosley*, the prosecutor stated in closing:

" 'Well, the fact of the matter is, ladies and gentlemen, my witnesses were telling the truth, okay?'

" 'Ladies and gentlemen of the jury, the title of this case isn't *State vs. William Miller*. It's *State vs. Maurice Mosley*, and don't let the defendant confuse you about who's on trial. And that's his whole game anyway, ladies and gentlemen, is to confuse you about the evidence, okay?'

" 'And they want you to focus on, again, the inconsistencies in the statements, but I guarantee you, ladies and gentlemen, if my witnesses would have come up

here and had the exact same story, they would have yelled conspiracy, okay?' " 25 Kan. App. 2d at 524.

No contemporaneous objection was made following any of the offending statements in the *Mosley* case. The *Mosley* court found that the comments, although perilously close, were not so egregious as to require a reversal. 25 Kan. App. 2d at 525.

The prosecutor in this case also commented on the possibility of there being more evidence against McCray than came out at trial. Regarding Damon Hall, the prosecutor stated, "[T]here's probably more he knows, but the more he tells, the more he keeps implicating the defendant." There was no objection to this comment.

In closing argument, the prosecutor may draw reasonable inferences from the evidence but may not comment upon facts outside the evidence. *State v. Hutcherson*, 25 Kan. App. 2d 501, 506, 968 P.2d 1109 (1998). The prosecutor's suggestion in this case, that Damon Hall could provide more evidence than he had, was clearly improper.

Having determined that some of the prosecutor's remarks in this case were outside the bounds of proper argument, we must now determine whether the prosecutor's remarks, in light of the record as a whole, were so prejudicial that the defendant was deprived of his constitutional right to a fair trial. See *Collier*, 259 Kan. 346, Syl. ¶ 5.

We agree with the *Mosley* court's statement that it is extremely dangerous to allow a prosecutor's zealousness to be given too loose a rein and care must be exercised not to inappropriately denigrate opposing counsel or inject personal evaluations of the honesty of witnesses. *Mosley*, 25 Kan. App. 2d at 525.

A prosecutor's improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial. *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

After reviewing the record and the law, we are able to declare the error had little, if any, likelihood of having changed the result of the trial and are able to declare such a belief beyond a reasonable doubt.

## RIGHT OF CONFRONTATION

Edward Mason, a State's witness, had testified at McCray's first trial which resulted in a mistrial. Mason was incarcerated in the Jefferson County jail where McCray was held pending McCray's first trial. At McCray's first trial, referring to the victim, Onzie Branch, Mason testified that McCray had told him (Mason) that (McCray) had "popped [Branch's] ass." Mason testified that as McCray made the statement, McCray made a shooting action with his right hand, palm facing down, wrist tilted downward.

Mason, who had been released from incarceration, was subpoenaed to appear as a witness for McCray's second trial. Mason failed to appear. After Mason failed to check in to the police or the prosecutor's office as instructed, the State sent officers to the postal carrier to obtain Mason's last known address, to talk to Mason's neighbors, and to contact Mason's relatives and his probation officer. In addition, officers checked the various agencies which might have had information as to Mason. No one was able to provide information as to Mason's whereabouts.

The trial judge found Mason was unavailable to testify and determined that because McCray had an opportunity to vigorously cross-examine Mason at the first trial, the defendant would not be denied the right to meet the witness face to face as required by K.S.A. 1998 Supp. 60-460(c). The trial court allowed the State to have Mason's prior testimony read back to the jury. McCray asserts the State did not attempt with due diligence to locate Mason and the State failed to demonstrate that Mason's testimony was sufficiently reliable.

Challenging Mason's reliability, McCray points out that Mason was a convicted felon of burglary, a crime of dishonesty. He argues that, at the first trial which ended in a hung jury, the jury had the opportunity to draw conclusions about Mason's credibility from Mason's demeanor while testifying. McCray contends that the reading of Mason's testimony prejudiced him because that procedure denied the jury the opportunity to observe Mason's courtroom demeanor and assess his credibility.

Admitting the prior testimony of an unavailable witness does not violate the Confrontation Clause of the United States Constitution.

*California v. Green*, 399 U.S. 149, 165, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970) (citing *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895). In *Mattox*, the defendant, after his third trial, had been sentenced to death for a murder allegedly committed in a part of the Indiana Territory within the exclusive jurisdiction of the United States. Mattox had been once convicted and that conviction was reversed. A second trial resulted in a hung jury. At the third trial, the government introduced, by transcript, the testimony of a witness who had died since the preceding trial.

With respect to the requirement that the factfinder must be allowed to observe the witness' demeanor upon the stand, the United States Supreme Court in *Maddox* stated that "general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case." 156 U.S. at 243. "The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination." 156 U.S. at 244.

The Sixth Amendment right of confrontation is satisfied if the accused confronted the witnesses against him at any stage of the proceedings in the same case and has had an opportunity of cross-examination. *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987). K.S.A. 1998 Supp. 60-460(c)(2) permits the use of testimony from a former trial of the same action if the declarant is unavailable at the trial and the adverse party had the right and opportunity to adequately cross-examine at the former trial.

The standard for determining if a witness is unavailable is the "reasonable diligence rule," *State v. Vargas*, 260 Kan. 791, 799, 926 P.2d 223 (1996), requiring a " 'good faith effort to obtain the witness' presence at trial.' " (Quoting *State v. Watie, Heard & Heard*, 223 Kan. 337, 340, 574 P.2d 1368 [1978].) "The question of availability turns on the totality of the facts and circumstances of each case." *Vargas*, 260 Kan. at 799. A trial court's determination that a witness is unavailable to testify will not be disturbed on

appeal unless an abuse of discretion is shown. *State v. Cook*, 259 Kan. 370, 375, 913 P.2d 97 (1996).

A trial court abuses its discretion only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *State v. Baacke*, 261 Kan. 422, 427, 932 P.2d 396 (1997). Mason's statements introduced in this trial were prior court testimony in the same case; therefore, McCray's Sixth Amendment right of confrontation has been satisfied. The trial court did not abuse its discretion in admitting the prior court testimony at McCray's second trial.

Affirmed.